(No. 24895.—

EMMA SHUTAN, Appellant, *vs.* JACOB BLOOMENTHAL *et al.* Appellees.

*Opinion filed April 14, 1939.*

John A. Bloomingston, for appellant.

Robertson, Crowe & Spence, (Eugene P. Kealy, and Henry L. McIntyre, of counsel,) for appellees.

Mr. Justice Wilson delivered the opinion of the court:

The plaintiff, Emma Shutan, brought an action in the superior court of Cook county against the defendants, Jacob Bloomenthal and E. R. Bennecke, co-partners, doing business as Bloomenthal and Bennecke, to recover damages for alleged negligence in the course of dental services rendered to her. Plaintiff, fifty years of age, was an employee of a safety deposit company in Chicago. Defendants, specialists in extractions, are engaged in the practice of the dental profession. By her complaint plaintiff charged that incident to an unskillful extraction of one of her teeth defendants broke her jaw, negligently failed to discover it was broken and failed to treat the jaw for some time afterwards, whereby infection ensued, and, further, failed to give the jaw proper attention so that it became infected and healed in such a manner as to prevent a proper closure of the teeth. Defendants interposed their answer denying the charges of negligence. At the conclusion of plaintiff's evidence, and again at the close of all the evidence, defendants made motions to instruct the jury to find them not guilty. Both motions were denied. The jury returned a verdict of $2500

in favor of plaintiff, and judgment was rendered on the verdict. Upon appeal, the Appellate Court for the First District held that the trial judge should have directed a verdict for the defendants, reversed the judgment of the superior court, without remanding, and entered judgment against plaintiff for costs. (*Shutan* v. *Bloomenthal,* 296 Ill. App. 301.) We have granted leave to appeal.

The evidence, so far as pertinent to defendants' alleged negligent treatment of plaintiff subsequent to the extraction, will be reviewed for the sole purpose of determining the propriety of the respective rulings on the motions to direct a verdict. On March 20, 1934, because of discomfort caused by a wisdom tooth, the third molar in the lower left jaw, plaintiff went to Dr. Nate Summerfield. Upon his advice an X-ray picture of her jaw was taken. Dr. Summerfield examined the X-ray and told her that she had an impacted molar. Saturday, March 24, plaintiff experienced pain while at work, communicated with Dr. Summerfield who recommended removal of her tooth, and made an appointment for her with defendants. Plaintiff went to their office about 4:00 P. M. on the day named, showed them the X-ray of her impacted tooth, and they extracted it. In the course of the extraction plaintiff's jaw was fractured. She remained in defendants' office about half an hour after coming out from under the anaesthetic, suffering intensely. When she arrived at her home she was in great pain and immediately went to bed. She stated that when she attempted to move her jaw she experienced a grating or clicking sensation between the bones of the jaw. Her adult son called defendant Bennecke who suggested that plaintiff continue to take sedatives for another hour or so, and if no results were obtained to summon a physician. Dr. Max Gethner, the physician who was summoned, gave plaintiff a hypodermic to ease her pain and to induce sleep. The next day, March 25, her family physician, Dr. Mary Shutan, gave plaintiff a sedative. Dr. Shutan requested one of the

defendants to come to plaintiff's home and assume the care of the patient. On this same day, March 25, plaintiff noticed an inability to open her mouth, stating that when she attempted to do so, there was a grating of the teeth—almost a clinch—and that her jaw started swelling. After urgent requests by plaintiff's son on March 26 and 27, defendant Bloomenthal visited plaintiff on the fourth day after the extraction, Wednesday, March 28. Plaintiff testified that she informed him of the pain she was suffering, that she could hardly open her mouth, and that when she did there was a grating and clicking. According to plaintiff, he said nothing and departed after administering a mouth wash. Defendant Bloomenthal went to plaintiff's home a second time on Friday, March 30, and gave her the same treatment. In the meantime plaintiff received sedatives prescribed by Dr. Shutan. Saturday, March 31, plaintiff visited defendants at their office. From her testimony it appears that defendant Bloomenthal again merely syringed her mouth. X-rays were not taken, the defendants informing her that she could not open her mouth wide enough to insert a film to take a picture. On this occasion, plaintiff also testified, she told defendants that her jaw was very painful and that there was a decided grating or clicking if she attempted to open it. No X-rays were taken on plaintiff's next visit to defendants on Monday, April 2. She said that there was then no change in her mouth, her jaw was still swollen, and she could not open her mouth. Again, on Tuesday, April 3, she repaired to defendants' office. Her condition was unchanged, except that she was more uncomfortable. X-rays by defendants were taken for the first time on Wednesday, April 4, eleven days after the extraction. Upon plaintiff's return two days later, on Friday, April 6, defendants informed her that there was some sloughing of the bone. Neither at this time, nor at any time thereafter, did defendants tell her that the jaw bone was broken. Plaintiff reported to defendants she had dis-

covered a piece of bone in her mouth. She testified that when she showed it to them they said it was perfectly natural. X-rays of plaintiff's jaw were taken by defendants three or four times during the period plaintiff continued to visit them, but, according to her, they never referred to the pictures in her presence. It appears one of the defendants visited an oral and plastic surgeon, Dr. Joseph E. Schaefer, to obtain his interpretation of the pictures which they had taken, "because," defendant Bennecke says, "the lady was having so much trouble. We wanted a little help." Plaintiff was not advised of this consultation. Defendant Bennecke, upon cross-examination as a witness called by plaintiff conformably to section 60 of the Civil Practice act, testified that when these pictures were taken he found "a little crack there in the jaw. A line where the tooth was extracted. Just a dark line; no appreciable separation of the bone, or anything of that sort." Again, referring to the X-ray pictures taken in their office, defendant Bennecke testified he took an intra-oral picture and discovered that plaintiff had what he called a cracked jaw but that he did not tell her he had cracked her jaw, "because it would make her worry, the psychology would be bad for her." He added that there was no displacement in the jaw, and that it had not been wired or immobilized. Defendant Bloomenthal testified that he told plaintiff there was a sequestrum which would be removed but that he never told her there was a crack in her jaw, "because of the mental effect it has sometimes." It appears from plaintiff's testimony that about a week and a half after the extraction, in addition to the pain and grating of the jaw each time she attempted to open it, she noticed a gradual paralysis of the chin from the middle of the chin over to the left side, a condition which had remained with her to such an extent that every time she opened her mouth to speak there was a feeling of "drawing down in the corner," and that unless she watched carefully, she drooled out of the side of her

mouth. She also testified that at the time of the trial she was unable to chew on the left side; that it was about three months after the operation before she could completely open her mouth; that her teeth "don't fit down;" that the center of her top teeth came nowhere near the center of the bottom teeth, and that, prior to the operation, she had no such difficulty. Plaintiff returned to work about ten days after the extraction but worked only three or four hours a day the first week. She resumed her regular hours of employment at the end of the first two weeks.

Obtaining no relief from defendants, and her jaw constantly growing worse, plaintiff, on April 19, went to her family dentist, Dr. Frederick W. Nannestad, who took an X-ray. Two days later he sent her to Dr. Schaefer, the same oral surgeon whom defendants had previously consulted with respect to their pictures of plaintiff's jaw. Dr. Schaefer examined the X-ray made by Dr. Nannestad and also the one taken by Dr. Summerfield. He operated on plaintiff on April 21, removing a sequestrum, a detached piece of dead bone that came from the region of the lower third molar, about a quarter of an inch segment. He testified that plaintiff was having trouble with the socket when she came to him and, on his first examination, this piece of bone was detected; that he scraped the socket and curretted out the loose piece of bone. Plaintiff continued in Dr. Schaefer's care, improving rapidly after the operation although she had difficulty in opening her mouth for a considerable period. He gave her a final check-up in October.

Dr. Nannestad took X-rays of plaintiff's jaw on at least three occasions while she was being treated by Dr. Schaefer. He testified that from the picture taken April 19—before plaintiff was operated on by Dr. Schaefer—he found she had a complete fracture of the jaw. In particular, he testified that a distinct shadow on the picture denoted a fracture as well as a loose triangular piece of bone, and that the fracture showed all the way through the jaw bone. The

witness then examined the picture made May 8. He stated that he could still see the fracture and, referring to the triangular space in which the piece of bone had been removed, said that when he saw a dark shadow running through the bone in the manner mentioned it indicated a complete frac-. ture of the jaw, being in what is denominated the mandible, one of the thinnest points of the jaw bone. A picture taken November 7, 1934, according to Dr. Nannestad, reflected continued improvement although there still remained some evidence of non-union of the fracture. Examining a picture taken August 17, 1935, the witness noted only slight evidence of the fracture. This witness testified further that when he took the last picture in 1935, the occlusion was not normal; that the jaw bone had healed in such manner that the upper and lower teeth did not correctly come together, a condition known as malocclusion; that he considered there had been a complete bony union, and that, in his opinion, the condition of occlusion then present (1935) was permanent.

As a witness under section 60 of the Civil Practice act, defendant Bennecke testified that he did not discover a fracture of the jaw when X-ray pictures were taken eleven days . after the extraction, and, further, that he never made such discovery at any time. All the pictures of plaintiff's jaw taken by defendants, it appears, were destroyed in a fire in their office in May, 1936, after plaintiff had commenced suit against them and prior to the trial. When the X-ray picture taken by Dr. Nannestad on May 8, 1934, was exhibited to defendant Bennecke he stated that none of the pictures of plaintiff's jaw taken by him resembled it, admitting, however, that the picture taken May 8 showed a comminuted fracture of the jaw,—namely, a fracture in which the bone is broken into more than one piece. On cross-examination, later, this defendant stated that the picture taken April 19 showed a comminuted fracture. He testified, further, that during the period he was treating

plaintiff she did not have much swelling in the jaw, no more, he declared, than would result from an ordinary extraction. Contradicting plaintiff's testimony, defendant Bennecke testified that she never complained to him of a sensation of grating or scratching in her jaw, and that a complaint by her would have immediately suggested there might be some crepitation which would be indicative of a fractured bone. The witness also testified it frequently occurs that after an impacted wisdom tooth has been extracted the patient's mouth cannot be opened for a week or so afterwards; that they, defendants, took the X-ray pictures because there was swelling or inflammation of the tissues at the point where the mandible and cheek bone come together, suspecting the possibility of injury there as they had used instruments which sometimes do produce fracture, and that a fracture of the jaw is not unusual in the extraction of third molars, which are located in about the weakest part of the jaw. He explained that although he was not looking for a broken jaw when he took the pictures he was looking for trouble. The testimony of defendant Bloomenthal as a witness under section 60 is substantially to the same effect. The latter stated that crepitation or grating, in addition to a crack, would be evidence indicating a fracture, but denied that plaintiff ever told him she had any grating.

Dr. Sheppard Remington, a physician and orthopedic surgeon, expressed the opinion that the picture taken by Dr. Nannestad on April 19 disclosed a complete break of the lower mandible. Explaining the difference between a picture taken in November, 1934, and the one made April 19, the witness replied: "This is a side view of the lower jaw including the teeth and shows this line here which is not solidified as to new formed bone as yet, and completely shows this line of fracture all the way through." The picture taken August 17, 1935, he stated, disclosed a well-healed fracture. Responding to a hypothetical question, Dr. Remington said that the failure to immobilize a broken

jaw, such as shown by the pictures introduced in evidence, could cause both a condition of anaesthesia in the jaw and a condition of malocclusion. Further, he said that when the jaw is fractured the parts should be immobilized.

Defendant Bloomenthal, testifying in his own behalf, stated that he treated plaintiff's case as one of infection and that he did not change his course of treatment in any way after the pictures were taken. He said that he examined plaintiff's mouth and jaws, both at her home and his office, and found no displacement or malocclusion, or any evidence of crepitation. On cross-examination, he stated that if a person has a complete severance of the mandible at a point approximating the third molar so there is crepitation or grating, immobilization of some kind is indicated. Corroborating defendant Bloomenthal, his partner also said that upon examination he and his associate found no grating, no displacement, and no malocclusion of the teeth. On the contrary, according to defendant Bennecke, plaintiff could close her teeth normally. He also stated that if the work is done skillfully, carefully and due regard given to the size of the jaw, the character of the bone and other component characteristics of the jaw, an extraction can be accomplished without breaking the jaw.

Dr. Schaefer, testifying for defendants, stated that on his initial inspection of plaintiff's jaw there was no marked displacement or occlusion; that the occlusion seemed fairly satisfactory and that there was no malalignment of any kind. He testified, further, that on his examination made on her first visit he saw nothing to indicate a fracture of the jaw, and that there was no evidence in the four or five sets of X-rays he took, or in those taken by anyone else he saw, indicating any comminuted fracture of the jaw. Infections are frequent following extractions, he said, for the reason that when a tooth is extracted the soft tissues have been injured, the mouth is full of bacteria making it quite common for infection to develop; that plaintiff's inability to open her jaws and the attendant pain were not unusual,

and that infection following the extraction of a tooth could have produced all the symptoms which he treated. He stated, further, that at no time did he feel any crepitation in the patient's jaw. Although he declared that the X-rays could not be read without clinical findings he also asserted that it is possible to definitely determine a fracture of the jaw by an X-ray if it is completely broken through. On cross-examination, he said that if at the time he first saw plaintiff she had just had the extraction and she had told him she had some grating at the point of the swelling, and also that she had other symptoms of difficulty in opening her mouth, and the X-ray showed a crack, he could have very definitely decided that her jaw ought to be immobilized. Pointing out that plaintiff did not come to him as a patient until nearly a month had passed after the extraction and that nature had had considerable time to do some repairing, he testified, further, that if plaintiff had been under his care the first day after the fracture he might have been able to determine whether there had been a complete severance. He declared that if following complete severance, there was no immobilization and there was crepitation, and within ten days an anaesthesia on the left side of the jaw appeared, he could see the relationship between such a fracture and non-care of the fracture, and the lack of sensation in the side of the face. Upon re-direct examination, Dr. Schaefer testified he did not recall that plaintiff ever mentioned to him during the period she was under his care that she had any loss of sensation in the face or any anaesthesia.

Two other dental experts testified, one for plaintiff and the other for defendants. Dr. Frank J. Bernard, an oral surgeon and extractionist, testified, in defendants' behalf, that he could see nothing in the picture taken April 19, 1934, indicating a fracture of the jaw. Testifying for plaintiff, Dr. N. S. Zeitlin, a roentgenologist, examined the same picture and expressed the opinion that it showed a comminuted or complete fracture. Further narration of their testimony is unnecessary.

Plaintiff insists that the trial court properly denied defendants' motions for a directed verdict for the reason that there is evidence in the record to show that defendants concealed from her the fact that her jaw was broken after they knew of the fracture and, further, that in consequence of their failure to immobilize the jaw or to direct her to have it done, the jaw healed out of alignment and became paralyzed. A motion to direct a verdict is in the nature of a demurrer to the evidence. In considering such a motion the evidence must be considered in its aspects most favorable to the party adverse to the motion. (*Blumb* v. *Getz,* 366 Ill. 273; *Darmody* v. *Kroger Grocery Co.* 362 id. 554; *Toombs* v. *Lewis,* id. 181; *Pollard* v. *Broadway Central Hotel Corp.* 353 id. 312.) Where the evidence in an action at law tried by a jury is conflicting and the evidence for the plaintiff unquestionably tends to establish a cause of action, the Appellate Court is not authorized to reverse a judgment for the plaintiff, without remanding the cause. (*Darmody* v. *Kroger Grocery Co. supra; Mirich* v. *Forschner Contracting Co.* 312 Ill. 343.) If the Appellate Court does reverse a judgment for the plaintiff without remanding the cause, we will consider the evidence to determine whether it tends to establish the cause of action alleged. *Toombs* v. *Lewis, supra; Pollard* v. *Broadway Central Hotel Corp. supra.*

Here, the evidence construed most favorably to plaintiff, tends to show that prior to the extraction of her third lower molar by defendants on March 24, 1934, her lower left jaw was neither maloccluded nor paralyzed; that defendants broke her jaw during the process of extraction; that one of them, with reluctance, visited her at her home; that eleven days after the extraction they took X-rays of the jaw and, by their own testimony, ascertained that she had a cracked jaw but did not so advise her; that the existence of a fracture of the jaw may be definitely determined by an X-ray if it is completely broken through; that an X-ray picture taken April 19, before she received treatment

by another dentist, disclosed a complete fracture; that plaintiff repeatedly told defendants she had grating of the bones of the jaw when she moved it; that a cracked jaw, accompanied by a grating sensation, is indicative of a complete fracture; that the usual and accepted treatment for a condition of complete severance is immobilization of the jaw; that this treatment was neither given nor prescribed, and that as the result of defendants' failure in this respect a permanent condition of malocclusion of the jaw and paralaysis of the jaw and chin developed. On the other hand, there is testimony to the effect that the jaw, if broken, was not a complete or comminuted fracture but merely an incomplete or partial fracture or crack and that the treatments given by defendants were recognized as proper in the latter type of fracture. Likewise, defendants deny that plaintiff made complaint with respect to a grating sound or noise in her jaw. On these and other controlling factual questions the testimony is conflicting. The testimony of both defendants and of Dr. Schaefer is, however, in accord that if there was a crack in the jaw and also a grating when plaintiff opened her mouth those conditions would indicate a complete fracture. Similarly, the defendants, Dr. Remington and Dr. Schaefer agree that if there was a complete or comminuted fracture of plaintiff's jaw at the mandible, the condition would require immobilization. We are of the opinion, irrespective of the weight of the evidence, that the plaintiff's evidence, standing alone, tends to show that defendants did not use the skill and care in their treatment of plaintiff after the extraction which persons in the same profession ordinarily have used in similar circumstances and that she suffered permanent injury as the proximate result of their negligence. The motions to direct a verdict in favor of defendants were, therefore, properly denied by the trial judge.

Defendants' argument that the question presented for decision is merely one of erroneous diagnosis for which there is no legal liability (*Stacy* v. *Williams*, 69 S. W. (2d)

(Ky.) 697; *Walkenhorst* v. *Kesler,* 67 Pac. (2d) (Utah) 654; *Moore* v. *Tremelling,* 78 Fed. (2d) 821;) cannot avail them. The testimony tends to show more than a faulty diagnosis, namely, that defendants possessed actual knowledge plaintiff's jaw was completely severed but nevertheless treated it as a partially cracked jaw. Nor is there any question as to whether the proper treatment was given since it is conceded that no treatment was given or prescribed for a comminuted fracture.

*Bollenbach* v. *Bloomenthal,* 341 Ill. 539, is not decisive. There, plaintiff Bollenbach swallowed a piece of metal filling and tooth without the knowledge of defendants Bloomenthal and Bennecke. This court held that the doctrine of *res ipsa loquitur,* upon which Bollenbach relied, was inapplicable to the factual situation presented. Although defendant Bennecke testified, in the present case, that if an extraction is performed with requisite skill the operation can be performed without breaking the jaw, plaintiff does not contend that the mere fracture of her jaw by defendants constituted actionable negligence but predicates her charge of negligence in the non-treatment of a completely cracked jaw following an extraction. Obviously, no question of *res ipsa loquitur* is involved in the present case.

This court does not intend by anything said herein to express any view as to the weight of the evidence. This question is for the Appellate Court.

The judgment of the Appellate Court is reversed and the cause is remanded to that court, with directions to consider the errors relied upon for a reversal other than the one we have discussed, if any, and, thereupon, either to affirm the judgment of the superior court, or to reverse it and remand the cause for a new trial.

*Reversed and remanded, with directions.*